Filed 12/10/25  In re A.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re A.P., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085894 |
| Plaintiff and Respondent, | (Super.Ct.No. DPSW2400012) |
| v. | OPINION |
| S.T., | |
| Defendant and Appellant; | |
| A.P., a Minor, | |
| Respondent. | |

APPEAL from the Superior Court of Riverside County. Sean P. Crandell, Judge. Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

1

No appearance for Plaintiff and Respondent.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Respondent.

Defendant and appellant S.T. (Mother) appeals from the juvenile court's order at the 12-month review hearing held pursuant to Welfare and Institutions Code section 366.21[1] at which the juvenile court denied returning her son, A.P. (born in February 2008; Minor), to her care and custody in Guatemala.  On appeal, Mother contends the juvenile court erred by refusing to return Minor to her custody, and it relied on an improper standard in finding that Minor should remain in the United States.  Riverside County Department of Public Social Services (DPSS) did not file a brief, as it agreed with Mother that the juvenile court should have placed Minor in her care and custody.  Minor's counsel argues the juvenile court properly found that returning Minor to Mother's care would pose a substantial risk of detriment to Minor.

**FACTUAL AND PROCEDURAL HISTORY**

A.     SECTION 300 PETITION AND DETENTION

On January 2, 2024, E.P.D. (Father) and Minor, who was then 15 years old, were living in the United States in a home with D.R., Father asked Minor to gather his clothes so they could go wash them.  Minor took all of his clothes to the car, at which time Father informed Minor that they were moving.  Minor expressed to Father that he did not want to move out of their home and that he needed to go back inside the house to grab more of his belongings.  They got into an argument, and Father punched Minor in the nose with a

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

closed fist, resulting in Minor having a bloody nose and swollen lip. Father started driving and told Minor that no one was going to tell him what to do. He then punched Minor in the nose a second time. Minor reported that approximately two months prior to this incident, Father had punched and kicked him in the stomach causing bruising. Minor had found a bag with powder on the bed that he shared with Father. Minor reported that Father regularly drinks alcohol. The incidents of violence were reported to the police but Minor was not taken from the home. A sheriff's deputy spoke with Minor and Minor showed him a jacket with dried blood from when Father hit him in the nose. Minor also expressed that he wanted to attend school but Father would not let allow him to go.

A social worker spoke with D.R. on January 4, 2024. Minor had shown her bruises on his arm, which he claimed were caused by Father. Minor also texted D.R. photographs after Father had punched him in the nose. D.R. had not witnessed any physical violence between Father and Minor but had witnessed Father curse at Minor and be mad. Minor had shown D.R. the bag with a white substance he found on Father's bed, and she believed it was methamphetamine. She confronted Father but he denied using any controlled substances. D.R. gave a social worker the photographs of Minor, which showed a scab or dried blood on his chin, a swollen lip and blood on his clothing.

Father was arrested on January 5, 2024. Minor stayed in the custody of D.R. Minor was interviewed by DPSS on January 5, 2024. Minor had come to the United States with Father five years prior, and Mother lived in Guatemala. Minor also confirmed that Father did not allow him to attend school, and he told the social worker that Father punched him in the nose. Minor indicated that Mother called while they were

3

in the car and Father threatened Minor not to tell Mother what had happened or it will be "worst next time." They drove to their new home and Father told Minor to clean the blood off his face. Minor confirmed that Father regularly used physical discipline and sometimes would kick him as a form of discipline.

Minor confirmed that two months prior, Father had been drunk and punched him four times with a closed fist. Father punched him two times in the stomach, one time in the ribs, and once in his face. There were no witnesses but Minor showed D.R. his injuries. Minor had seen Father drink and pass out with "Crystals" around him; he had observed Father crush the crystals into powder and snort the powder up his nose.

D.R. confirmed that Minor showed her the bruises on his stomach. She also stated that once Father started drinking he was unable to stop. D.R. had not witnessed Father be physical with Minor but had heard him curse and yell at him. D.R.'s son also confirmed that Minor had shown him bruises Minor claimed were caused by Father; the son had witnessed Father drinking alcohol.

A social worker spoke with Mother, who lived in Guatemala. She wanted Minor to stay with D.R. She claimed to be unaware that Father had been abusing Minor. Mother insisted that Minor had first disclosed to her about the abuse on January 4, 2024. While Father was living with Mother in Guatemala, he had hit her. She denied that her children witnessed the abuse. When Father was in Guatemala, he would drink every two weeks. She was aware that recently Father had been drinking more. She tried to talk to Father about not drinking in front of Minor, but did not push the issue as she feared he would get upset and take it out on Minor. She did not know that Father was using drugs

4

until told so by Minor, but she could not recall when Minor told her. Mother wanted custody of Minor if he was not able to live with D.R. or a maternal uncle.

Father was interviewed. He was still in custody. He and Minor had come to the United States five years prior in order to give Minor a better life. He also claimed that he fled Guatemala because men in a gang were trying to get him to join and were sending him death threats. He was seeking asylum. Father denied there was a physical altercation on the day that he told Minor they were moving out of D.R.'s home. He denied he had ever put his hands on Minor. He never saw Minor get a bloody nose. He was not aware of any bruises that were on Minor's stomach. He thought Minor may have obtained the bruises because he and D.R.'s son oftentimes wrestled. He denied taking drugs and was willing to drug test. He did not regularly drink alcohol as he was always working. He had trouble with his pancreas and if he drank excessively he would end up in the hospital. Minor was not attending school but Father insisted it was because Mother had failed to send Minor's birth certificate and documentation from Guatemala so he could be enrolled. Father was in custody on a felony charge of corporal punishment; five misdemeanor charges involving DUI warrants; and one charge of parent chronic truancy. He would remain in custody until his first appearance on January 9, 2024. He had a criminal history of DUI arrests and convictions. Father stated he was the biological father of Minor.

The Department was concerned about leaving Minor in Father's care as there was risk of continued physical abuse. Minor was placed with D.R. Mother was in Guatemala

5

and could not do in-person visits with Minor. Photographs of Minor's injuries were provided with the detention report.

DPSS filed a section 300 petition for Minor on January 9, 2024. Mother and Father both denied any Indian ancestry. It was alleged in the section 300 petition, under serious physical harm pursuant to subdivision (a), that Minor suffered serious physical harm in that Father punched Minor in the face resulting in a bloody nose and abrasion on his chin. Further, on or about January 5, 2024, Father punched Minor in the stomach and ribs resulting in bruising. Father had been arrested for inflicting corporal punishment on a child. Under failure to protect, section 300, subdivision (b), it was alleged that Mother (1) should have known or reasonably known that Minor was at risk of abuse and/or neglect by Father in that she admitted Father had been physically violent in the past and Minor disclosed to Mother that Father was drinking and using controlled substances; and (2) she was not a member of the household and failed to provide Minor with adequate food, clothing, shelter, medical treatment and/or protection.

It was alleged against Father pursuant to section 300, subdivision (b)(1), that he utilized inappropriate discipline including kicking and punching Minor, resulting in bruises, and he was arrested for corporal punishment on a child; he neglected Minor's educational needs by refusing to allow Minor to attend school; and Father abused and had a history of abusing controlled substances including alcohol placing Minor at risk of suffering physical and emotional harm. It was alleged under section 300, subdivision (g), no provision for support, that Mother was unable and/or unwilling to provide Minor with care and support due to her residing outside the country. It was alleged under the same

6

provision against Father that he was currently incarcerated and was unable and/or unwilling to provide Minor with care and support.

The detention hearing on the section 300 petition was held on January 10, 2024. Minor was appointed counsel. Mother appeared by telephone. Minor's counsel represented that Minor had not attended school in three years. Minor wanted to attend school. Mother wanted Minor returned to her care in Guatemala and was very upset about how Father cared for Minor. Mother's counsel requested that DPSS start the process of working with the Guatemalan Consulate for a home study for Mother. Mother's counsel also requested liberalized telephone contact between Mother and Minor. Minor's counsel advised the juvenile court that Minor did not want to return to Guatemala.

The juvenile court found a prima facie case had been shown to support the section 300 petition. Father was named the presumed father. Mother and Minor were to have liberalized communication. DPSS was to reach out to the Guatemalan Consulate to begin the home evaluation process. Minor was to be enrolled in school.

B.      JURISDICTION/DISPOSTION REPORT AND HEARING

DPSS filed the jurisdiction/disposition report on February 6, 2024. DPSS recommended that the juvenile court find all of the allegations in the petition true except for the allegation that Father was incarcerated and could not provide for Minor. Minor should remain detained and Mother and Father should be granted reunification services. Minor remained in the care of D.R.

Minor was interviewed on January 23, 2024. He confirmed the allegations in the petition. Minor disclosed that Father drove twice while under the influence. Minor was starting high school the following day. Minor felt safe and comfortable in D.R.'s home. Minor wanted Mother to come to the United States rather than him going to Guatemala. He disclosed that someone made a death threat against Father, and he was unsure if the family was at risk. Mother spoke with Minor every day on the phone. Minor was unsure if he wanted to have visits with Father.

Mother was interviewed on February 1, 2024. Minor had left Guatemala when he was 10 years old. She did not know anything about Father abusing Minor. As to Minor not attending school, Mother stated that she and Father were concerned about Minor attending school alone. When Minor was in Guatemala, she would walk him to school. She admitted telling Father not to put Minor in school until he could care for himself. Mother had daughters who lived with her. Mother wanted her brother assessed for placement of Minor but she also wanted Minor returned to her care. Father was not interviewed but had been released from jail on January 24, 2024. The jurisdiction/disposition hearing was set contested.

An addendum report was filed on March 6, 2024. The Department sought to strike the allegations in the petition under section 300, subdivision (g), and the allegation under section 300, subdivision (b), against Mother—that she was not a member of the household and failed to provide Minor with adequate food, clothing, shelter, medical treatment and/or protection. The remainder of the allegations in the petition should be found true. An amended petition was filed reflecting the striking of these allegations.

8

Father had been approved for anger management classes and had enrolled in parenting classes.

A social worker met with Minor at his high school on February 28, 2024. He was doing well in school and he liked living with D.R. He had recently had a physical and there were no reported problems. He spoke with Mother on the telephone every day. Another social worker spoke with Minor by telephone. He reported doing well in school. Minor had some concern that Mother was asking him to work so that he could send money to the family in Guatemala. Minor was advised by the social worker that his priority was attending school. Mother had also informed Minor that Father was going to pick him up from his placement with D.R. The social worker assured Minor that Father was not going to be picking him up. Minor had started therapy.

The contested jurisdiction/disposition hearing was held on March 11, 2024. Mother submitted the following stipulated testimony: "I love my son and I sent him to the U.S. for a better life. I would like for him to come back to Guatemala. But if he does not want to, I want him to be placed with his uncle [J.C.L.]." Mother's counsel asked that DPSS continue to work with the Guatemalan Consulate to attempt to do a home study of Mother's residence "in the event [Minor] would change his mind and be interested in going back to his home country." Mother had assured her counsel she would no longer advise Minor that he needed to work to provide for the family. Mother submitted on the allegations in the amended petition. Father also submitted stipulated testimony that he loved Minor. He denied the allegations in the amended petition and hoped to reunify with Minor.

9

The juvenile court found the allegations in the amended petition to be true by a preponderance of the evidence. Mother and Father were both given reunification services.

C.     SIX-MONTH REVIEW REPORT AND HEARING

DPSS filed their six-month review report (§ 366.21, subd. (e)) on August 22, 2024. DPSS recommended that Minor remain out of the custody of Mother and Father, and that both parents continue receiving reunification services. DPSS also recommended that visitation with both Mother and Father include unsupervised, overnight and weekends and/or placement on Family Maintenance.

Mother reported that she lived with her four other children in a five-bedroom house owned by maternal grandmother. Mother worked full time at a bakery. Mother had no criminal history. Father stated that he and Mother were married and had maintained their long-distance relationship. Father had a full time job at a warehouse and lived with his sisters in Riverside. Minor was receiving both medical and dental care. Minor had completed his therapy sessions and was regularly attending school. Minor continued to do well in his placement with D.R.

Mother had been referred to parenting classes in Guatemala and was participating. Mother had a psychological assessment and was found to be emotionally stable and able to care for Minor. The Guatemalan Consulate recommended that Minor be returned to Mother's care. A home assessment had been completed but needed to be translated to English. Father was participating in some of his services.

10

Mother and Minor had participated in supervised video chats and telephone calls during the reporting period. There had been no further conversations regarding Minor working to provide for his family in Guatemala. Minor did not want to visit with Father or return to his care.

Minor wanted to remain in the United States to continue his education. Minor did not want to return to the care of either of his parents. He also did not want to live with his maternal uncle. He felt safe and comfortable with D.R. Both Father and Mother wanted Minor returned to their care.

DPSS concluded that Minor could not return to the care of Mother as she had not addressed the issues of protective capacity and had just recently enrolled in parenting education. DPSS believed with additional time Mother could address these issues. DPSS was also still concerned regarding Mother advising Minor that he should work in order to provide for their family. Minor could not be returned to the care of Father as he still needed to address the issues of physical abuse and neglect that brought him to the attention of DPSS. Minor had expressed he was having continuing nightmares about the physical abuse. Reunification services should continue and liberalized visitation to include unsupervised overnights and weekends should be ordered by the juvenile court. Attached to the six-month review report was the home study of Mother's home in Guatemala but it was in Spanish.

At the six-month review hearing held on September 9, 2024, Mother's counsel stated that Mother sought to have Minor return to her care in Guatemala. She could enroll him in school and there were universities he could attend. Mother understood that

11

Minor did not want to return to Guatemala but was hoping he would change his mind. Minor was present in court and advised the juvenile court that he wanted to remain in the United States.

The juvenile court followed the recommendation of DPSS and ordered additional reunification services for Mother and Father. The juvenile court also ordered that DPSS could liberalize visitation to include unsupervised, overnight, weekends and placement on family maintenance if deemed appropriate. The juvenile court did note that if DPSS intended to place Minor with Mother in Guatemala it was to notify all counsel two weeks prior to any placement decision. DPSS was also ordered to provide a translated home study.

D.    TWELVE-MONTH REVIEW REPORT AND HEARING

On February 20, 2025, DPSS filed their 12-month review report pursuant to section 366.21, subdivision (f). DPSS recommended that the court terminate the dependency for Minor; terminate Father's reunification services; return Minor to the care and custody of Mother in Guatemala; and grant sole legal and physical custody to Mother. All visitation between Minor and Father would be supervised.

Father had an upcoming hearing on his criminal case on February 7, 2025. A criminal protective order that had been issued keeping Father from Minor was to expire on December 31, 2099.[2] Minor had no physical or mental health challenges. Minor's

---

[2] The record states the criminal protective order was issued until 2099 but section 136.2 limits criminal protective orders to the time " 'during the pendency of criminal proceedings and as prejudgment orders.' " (*People v. Ponce* (2009) 173 Cal.App.4th 378, 383.)

current caregiver, D.R., was meeting all of his needs. DPSS had reached out to a maternal uncle for placement of Minor but he had never returned any of their telephone calls.

Mother had been evaluated in Guatemala and found to be emotionally stable and able to care for Minor. Mother had completed online parenting classes. DPSS noted there was no family maintenance that could be imposed if Minor was sent to Guatemala. Father had enrolled in counseling services but not anger management classes. Father had completed his parenting classes.

Mother and Minor spoke on the telephone several times each week. Minor and Mother had a strong bond and Minor reported that he loved Mother. DPSS had some concerns at the beginning of the reporting period in that Mother had been asking Minor to agree to return to Guatemala. Minor reported that it caused him stress as he did not want to return to Guatemala. Minor did not see a future in Guatemala, and he was concerned that Father could freely return to Guatemala and hurt the family. Minor believed that authorities in Guatemala would do nothing to ensure his safety. Mother advised DPSS that she did not want to pressure Minor to return and only wanted to express how she loved Minor and wanted him under her care. Minor wanted no contact with Father.

Minor continued to express his concerns about returning to Guatemala. He was concerned that he would not have the same academic opportunities as he had in the United States and he feared that Father could return to Guatemala. Minor wanted to continue living with D.R.

13

DPSS stated that Minor should return to Mother's care as she completed her parenting classes and did not need therapy. Further, the Guatemalan Consulate recommended return of Minor to Mother's care. Minor could not safely be returned to Father's care. DPSS also provided a report card for Minor. He received A grades in all of his classes.

DPSS concluded, "Although the child does not want to return to Guatemala, due to fear of losing academic and citizenship opportunities[,] [t]he mother's home assessment and psychological assessment evaluation concluded a positive review, and the Guatemalan Consulate recommended for the child to return to the mother's case. Additionally, the mother graduated from parenting education and is actively engaged in visits and the relationship with [her] son is strong."

The translated home study and psychological assessment was provided with the 12-month review report. Mother stated that when Minor was 11 years old, he and Father went to the United States. Mother permitted Minor to go with Father. She had no idea that Father was abusing Minor. D.R. was the first to report the abuse to Mother. Minor finally admitted in January 2024 that Father was beating him. Mother acknowledged that Minor was doing well with D.R. Mother wanted Minor to be in her care. She would ensure that he attended school. Minor had told Mother that he wanted to remain in the United States so he could support the family and have a better future. Mother also acknowledged that there were no sources of employment in Guatemala in order for Minor to get ahead in life. Mother admitted that she knew Minor had not been attending school.

14

Mother was found to be able to take care of Minor and that she could take care of his needs. It was recommended that Minor return to her care in Guatemala.

Mother's home was assessed. It was built with block walls, the roof was a metal sheet with wooden planks, the floor was cement and tile. The home had four bedrooms, a kitchen, laundry area, toilet and shower. Four of Mother's other children lived in the home, ranging from seven to fifteen years old. Maternal grandmother also lived in the house. The home was spacious and clean. Mother had attended school and could read and write. Mother had the economic stability to care for Minor.

At a hearing on March 10, 2025, the parties asked that the matter be set contested. Father's counsel argued that Father was completing his services and objected to Minor being sent to Guatemala. Mother wanted Minor returned to her care despite him wanting to remain in the United States. Minor's counsel advised the juvenile court that Minor was "adamantly" opposed to returning to Guatemala. He loved Mother. Minor's counsel stated that it would be detrimental to return him to Mother's care as he was doing well in the caregiver's home, he would be 18 years old in one year, and he was doing very well in school. DPSS was ordered to provide an addendum report before the contested hearing. The juvenile court stated, "I would like the Department to articulate the basis for which it believes—because ultimately my goal is to focus on children's best interests. And I understand the minor's desire to stay here and the opportunities that would be available to him here, as opposed to in mom's home country of Guatemala, would likely be substantially and significantly different and whether the Court to take those into

consideration or if the Court's permitted to take those into consideration." DPSS was to interview Minor.

The Department filed its addendum report on April 3, 2025. It continued to recommend that Minor be returned to Guatemala and the dependency case be dismissed. It was in Minor's best interest to return him to the care of Mother as they had a strong connection. Mother was willing to care for Minor and had completed her case plan. Mother had ensured DPSS that she would continue Minor's education in Guatemala and the family had support. Despite Minor not wanting to return to Guatemala, the home assessment was positive and the Guatemalan Consulate agreed with Minor being returned to Mother. On April 1, 2025, Minor expressed to DPSS that he wanted to remain in the United States. He wanted to continue his education and go to college. He would not be able to acquire higher education in Guatemala. Minor also advised DPSS that if he returned to Mother's home "his father will return to Guatemala and harm him as he has made statements to him that if his mother ever had another relationship, he will kill her." Mother was aware of Father's statements. D.R. was like family to him.

Father reported he wanted Minor to return to Guatemala so he could be with his own family. Father reported he planned on returning to Guatemala "soon."

The contested 12-month review hearing was held on April 9, 2025. Minor was present. DPSS submitted on its 12-month review report and the addendum report. Mother's counsel advised the juvenile court that unless it found that returning Minor to her care "would create a substantial risk of detriment to the safety, protection, or physical or emotional well being of the child," the juvenile court must follow the DPSS

16

recommendation to return Minor to Mother. Despite Minor wanting to stay in the United States, Mother wanted him with her and could provide a life for Minor in Guatemala. Mother's counsel concluded, "Even though things look different there than here, I think that when you look at risk to a 17-year-old to return to his home country, given the information we have from mother's home study, that—it would not be a substantial risk to him." Father's counsel agreed stating that there was no substantial risk of harm to Minor if he was returned to Guatemala.

Minor's counsel asked that the juvenile court not follow DPSS's recommendation. Minor was adamant he did not want to return to Guatemala. He had been in the United States for six years. He was doing well in school and was doing excellent in the caregiver's home. There would be a substantial risk of detriment to Minor's well-being if he was returned to Mother's care. Minor had concerns that Father would return to Guatemala and Father had made threats to Mother. Minor's counsel concluded, "So I do believe that if we were to send [Minor] back to Guatemala, that father would return to Guatemala and there would be a substantial risk of emotional or physical harm to [Minor]."

The juvenile court first noted that it was a big decision that it was being asked to make on behalf of Minor. The juvenile court had read and considered all of the reports submitted by DPSS. It noted that Father had not begun his anger management classes. There was information from Minor that threats had been made by Father. There were incidents of violence between Minor and Father. The juvenile court was "not inclined to follow" DPSS's recommendations or continue Father's services. The juvenile court

acknowledged that Mother and Minor loved each other, and she had completed her case plan. However, it was not in Minor's best interest to be returned to Mother's care.

The juvenile court stated, "The Guatemalan Consulate is recommending that [Minor] return to them. And it wouldn't surprise me that a foreign country wouldn't want to put in writing that it's against a child's best interest to be sent back to that Third World country. [¶] And I have nothing against people from Guatemala. I've never been there. I have no personal knowledge of what it's like to live there. But I think it's pretty common knowledge that there's a tremendous influx of people from a variety of countries around the world, including Guatemala, trying to get into the United States." The juvenile court noted that it would be different if Minor was an infant or young child. Minor was fully capable to understanding of how this could impact his life.

The juvenile court concluded, "And while I understand the reason for the Department making the recommendation it's doing, given [Minor]'s maturity level, his continued expression that he does not want to leave the United States and go to Guatemala, I think that there is clear and convincing evidence that—based on the threats that have been made and his fear that there would be potential violence if he were to return to Guatemala, that it would not be in his physical best interest to return there; that given the likely loss of the tremendous opportunities and advantages that are here for him and the—lack of these opportunities somewhere else or in Guatemala, that it would be to his emotional detriment, and that is not what he wants." The juvenile court noted that it understood what Minor would be losing by not being with Mother, but they had been in touch with each other for the prior six years by telephone and video. Further, Minor

18

could make his own decision what to do when he turned 18 years old. "But in the next eight months, the Court is going to make the findings that it would be to the detriment of both his physical and emotional well-being were the Court to follow the Department's recommendations."

The juvenile court found that there was no likelihood that Minor could be returned to either parent within the next six months. Reunification services were terminated for Mother and Father, and the matter was set for a section 366.26 hearing and the juvenile court ordered a section 366.3 postpermanency hearing to explore Minor's participation in the non-minor dependency program. On April 11, 2025, Mother filed her notice of appeal from the findings at the 12-month review hearing.

## DISCUSSION

Mother contends there was no substantial evidence to support the juvenile court's finding at the 12-month review hearing that return of Minor to her care in Guatemala would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being. Mother insists that since she completed her case plan and her home was approved, the juvenile court should have placed Minor in her care. She further contends the juvenile court erroneously relied on a best-interest standard in reaching its finding that Minor should remain in the United States, when it was required to find a substantial risk of detriment.

Section 366.21, subdivision (f)(1) provides, "The permanency hearing shall be held no later than 12 months after the date the child entered foster care, . . . . At the permanency hearing, the court shall determine the permanent plan for the child, which

19

shall include a determination of whether the child will be returned to the child's home and, if so, when, within the time limits of subdivision (a) of Section 361.5. After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." "Regardless of whether the child is returned to their parent or legal guardian, the court shall specify the factual basis for its decision. If the child is not returned to a parent or legal guardian, the court shall specify the factual basis for its conclusion that the return would be detrimental." (§ 366.21, subd. (f)(2).)

"By authorizing the continued removal of a child from parental custody based on the risk of either physical detriment or emotional detriment, sections 366.21 and 366.22 focus on the child's well-being at the time of the review hearing rather than on the initial basis for juvenile court intervention. [Citation.] Thus, while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency [citation], the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) "Hence, the question whether to return a child to parental custody is not governed solely by whether the parent has corrected the problem that

20

required court intervention; rather, the court must consider the effect such return would have on the child." (*Id.* at p. 901.)

"[A]lthough the Welfare and Institutions Code does not provide for placement of dependent children in foreign countries, the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.) applies to juvenile dependency proceedings and allows for such placements." (*L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1037.)

"We review the juvenile court's finding of detriment for substantial evidence by considering whether the evidence, contradicted or uncontradicted, supports the court's finding." (*L.C. v. Superior Court*, *supra*, 98 Cal.App.5th at p. 1034.) " 'We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court.' " (*Id.* at p. 1034.)

Here, the juvenile court considered the entire history of the case in reaching its decision not to return Minor to Mother's care in Guatemala. The juvenile court did state that it had considered Minor's wish to remain in the United States. A minor is "entitled to have his wishes considered" but "a child's preference is not the deciding factor" in assessing detriment, "even when that child is a teenager." (*In re Patrick S*. (2013) 218 Cal.App.4th 1254, 1265.) However, the juvenile court did not solely rely on Minor's wish to remain in the United States. Additionally, the juvenile court was aware that Mother had completed her case plan and her home was approved. However, a decision whether to return a child to parental custody is not governed solely by whether the parent

21

has corrected the problem that required court intervention. (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 901.) As will be set forth, *post*, the juvenile court was concerned about Minor's physical and emotional well-being as he greatly feared that Father would return to Guatemala and hurt him or his family. This decision was supported by substantial evidence.

The family first came to the attention of DPSS because Father punched Minor in the nose. Minor then informed DPSS that two weeks prior, Father had kicked and punched him in the stomach. Minor suffered injuries, which he showed to D.R. as a result of these incidents. Mother disclosed that while Father was living with her in Guatemala, he had hit her. Minor did not want any contact with Father. Father did not participate in anger management classes. As a result of these incidents, Minor expressed on multiple occasions that he feared if he went to Guatemala, Father would find him and hurt the family. He expressed that Father had threatened to kill Mother. Minor was concerned that Guatemalan authorities would not be there to help him. Based on this evidence, the juvenile court found that there was a substantial risk of harm to Minor both physically and mentally if he returned to Guatemala as he feared that Father could harm him.

Mother contends that Father was seeking asylum in the United States and that Minor would actually be safer in Guatemala. It is true that at the beginning of the case, Father expressed that he was seeking asylum in the United States based on being threatened by gang members in Guatemala. However, in the addendum report, Father was interviewed and advised DPSS that he was planning on going to Guatemala "soon."

22

Even if Father's return to Guatemala was uncertain, Minor expressed being in fear of those who threatened Father in Guatemala, and was under the constant emotional distress of believing Father would come after Minor and his family while they were in Guatemala. This supports that it was detrimental to Minor's well-being to return to Guatemala.

In the reply brief, Mother claims that based on the criminal protective order issued in the United States expiring in August 2024, that if he was truly afraid of Father, he would be safer in Guatemala. However, DPSS presented evidence that a new criminal protective order was in place and expired in 2099. Minor reasonably could feel safer being in the United States with the criminal protective order in place.

Mother also complains the juvenile court relied on its own opinion in finding that Guatemala could not provide Minor educational or professional opportunities. While the juvenile court did consider that Minor expressed he would have a better life in the United States based on access to higher education and more opportunities, as outlined, *ante*, it was not the only consideration. We note that there was some evidence to support this conclusion by the juvenile court in that Mother and Father both stated Father took Minor went to the United States to provide Minor a better life. Mother also stated that there were less opportunities in Guatemala for Minor to make money and get ahead. Nonetheless, the primary concern of the juvenile court was that Father posed a substantial risk of harm to Minor if Minor was returned to Mother's care.

Mother also contends that the juvenile court continuously cited to Minor's "best interest" but the standard at the 12-month review hearing was "substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

As stated, at the 12-month review hearing, section 366.21, subdivision (f)(1), provides that the juvenile court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

At the beginning of the 12-month review hearing, Mother's counsel outlined the standard of substantial risk of detriment for the juvenile court. Moreover, the juvenile court in its ruling clearly relied on this standard, finding "the Court is going to make the findings that it would be to the detriment of both his physical and emotional well-being were the Court to follow the Department's recommendations." While the juvenile court at times referred to Minor's best interests, it was clear that it followed section 366.26, subdivision (f)(1), and found that the return of Minor to Mother's care in Guatemala would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of Minor.

# DISPOSITION

The orders of the juvenile court at the 12-month review hearing are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

McKINSTER

Acting P. J.

FIELDS

J.